<u>NOT FOR PUBLICATION</u>

<u>UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY</u>

_____
                                                        :
MARIA L. EVARISTO,                          :
                                                        :
              Plaintiff,                            :
                                                        :            Civil Action No. 07-5456 (JAG)
                    v.                                :
                                                        :            <u>OPINION</u>
COMMISSIONER OF SOCIAL          :
SECURITY,                                      :
                                                        :
              Defendant.                         :
_____:


<u>GREENAWAY, JR., U.S.D.J.</u>

      Plaintiff Maria L. Evaristo ("Plaintiff") seeks review of the Social Security

Commissioner's (the "Commissioner") decision denying her application for Social Security

Disability Insurance Benefits ("SSDIB"), pursuant to 42 U.S.C. § 405(g) (2000).[1]  Plaintiff

argues that the decision was not supported by substantial evidence, as required by § 405(g), and

that the Commissioner erred as a matter of law in denying the application.  For the reasons set

forth in this Opinion, this Court finds that the Commissioner's decision is supported by

substantial evidence, and should be affirmed.

_____

     [1] This section of the Social Security Act [hereinafter the "Act"] provides that any individual who was a party to a hearing before the Secretary may commence a civil action within 60 days after the Secretary's final determination.  The appropriate forum for this action is the district court of the United States judicial district in which the plaintiff resides.  42 U.S.C. § 405(g).

# I. <u>PROCEDURAL HISTORY</u>

On July 6, 2005,[2] Plaintiff filed an application for SSDIB, alleging that she was disabled beginning in November of 2004 due to orthopedic, neurological, neuropsychiatric, psychiatric, psychological, internal, cardiovascular, and other related medical conditions.  (Tr. 49.)  Upon review of the evidence on January 26, 2006, the Social Security Administration denied Plaintiff's claim.  (Tr. 30-32.)  On January 30, 2006, Plaintiff filed a request for reconsideration, (Tr. 33), which was also denied (Tr. 34).  Subsequently, Plaintiff requested a hearing before an Administrative Law Judge to review the application *de novo*.[3]  (Tr. 37.)  On August 28, 2007, Administrative Law Judge Dennis O'Leary ("ALJ O'Leary") issued his decision, based upon the record before him and testimony from the hearing held on July 13, 2007.  (Tr. 16-24.)

The following is a summary of his findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2.  The claimant has not engaged in substantial gainful activity since November 30, 2004, the alleged onset date.

3. The claimant has the following severe impairments: medial epicondylitis or "tennis elbow" and a neck impairment.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

---

[2] ALJ O'Leary states, erroneously, that the application was dated September 26, 2006, when in fact the transcript indicates that Plaintiff signed the application for SSDIB on July 6, 2006.  (Tr. 49-53.)

[3] If the claimant "receives an adverse reconsideration determination, he is entitled to an evidentiary hearing and *de novo* review by an administrative law judge."  <u>Heckler v. Day</u>, 467 U.S. 104, 106 (1984).

5. After careful consideration of the record, I find that the claimant has the residual functional capacity to perform a full range of light work. The claimant has the abilities to lift and carry up to twenty pounds occasionally, ten pounds frequently and, stand, walk and sit for six hours in an eight-hour workday.

6. The claimant is capable of performing past relevant work as a sewing machine operator. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

7. The claimant has not been under a disability, as defined in the Social Security Act, from November 30, 2004 through the date of the decision.

(Tr. 18-24) (citations omitted.)

Plaintiff requested review of ALJ O'Leary's decision on September 10, 2007. (Tr. 9.)

On November 2, 2007, the Appeals Council denied Plaintiff's request. (Tr. 5-8.) Accordingly,

ALJ O'Leary's decision became the Commissioner's final decision.

On November 12, 2007, Plaintiff filed a complaint in this Court, pursuant to 42 U.S.C. §§

1383(c)(3) and 405(g), seeking reversal of the Commissioner's decision.

## II. **STATEMENT OF THE FACTS**

### A. **Background**

Plaintiff was born on January 4, 1958 and has a fourth grade education level. (Tr. 60,

66.) Plaintiff understands some English, but cannot speak, read or write it.[4] (Tr. 260.) Plaintiff

speaks Portugese and Spanish. (Id.) Plaintiff has been a United States citizen for twenty three

years, and has worked as a sewing machine operator for twenty seven years. (Id.)

Plaintiff alleges that her work as a sewing machine operator required her to sit and bend

forward at the waist, as well as handle, grasp big objects, and reach, for eight hours a day. (Tr.

---

[4] It should be noted that in the Disability Report, Plaintiff stated that she can understand, speak, read, and write English. (Tr. 62.)

3

64.)  Her work also required her to lift twenty pounds occasionally, and ten pounds frequently.

(Id.)  Plaintiff stopped working November 30, 2004.  (Tr. 63.)

**B.**   **Claimed Disabilities**

Plaintiff claims that her disability commenced on November 30, 2004, due to orthopedic,

neurological, neuropsychiatric, psychiatric, psychological, internal, cardiovascular and related

conditions.  (Tr. 49.)  On July 13, 2007, before ALJ O'Leary, Plaintiff testified that she suffers

from pain in her elbows, back, and left leg; swollen feet; varicose veins;[5] and a small hernia[6] in

her foot.  (Tr. 261-73.)  Plaintiff claimed that she can only sit for twenty minutes and stand for

fifteen minutes at a time, due to her back pain.  (Tr. 267.)  Plaintiff also testified that she has

tendinitis[7] in her elbow and arthritis[8] in her shoulders.  (Tr. 265.)

In addition to having difficulty bending and lifting, Plaintiff stated in her disability report

that she is nervous, worried, depressed, and unable to concentrate.  (Tr. 63.)  Plaintiff's attorney

---

[5] Plaintiff stated that doctors operated on her left leg about fifteen years ago, due to varicose veins.  (Tr. 266.)

[6] Hernia is the "protrusion or projection of an organ through an abnormal opening in the muscle wall of the cavity that surrounds it."  MOSBY'S MEDICAL, NURSING & ALLIED HEALTH DICTIONARY, 808 (6th ed. 2002) (hereinafter "Mosby's").

[7] Tendinitis, also known as tendonitis, is "inflammation of a tendon, usually resulting from strain."  Mosby's at 1688.

[8] Arthritis, also known as rheumatoid arthritis, is "a chronic, inflammatory, destructive, and sometimes deforming collagen disease that has an autoimmune component . . . . It is characterized by symmetric inflammation of synovial membranes and increased synovial exudate, leading to thickening of the membranes and swelling of the joints."  Mosby's at 1505.

noted that Plaintiff suffers from medial epicondylitis[9] and multilevel degenerative disc disease[10] affecting the use of her hands, arms, and elbows.  (Tr. 259.)

Plaintiff stated that, due to her disabilities, she is only able to "watch TV, feed the dog and let him outside, eat lunch, read, walk and sit around the house, eat dinner, take a bath/shower, and go to bed."  (Tr. 77.)  She is unable to vacuum, buy groceries, iron, comfortably put on a shirt or wash her hair.  (Tr. 77-78.)  She is unable to cook large meals, and only makes sandwiches or instant soups with assistance.  (Tr. 78.)  Although she retained her driver's license, she does not drive, due to the pain in her arms.   (Tr. 79.)

## C.    Medical Evidence Considered by the ALJ

ALJ O'Leary noted that Plaintiff was treated by Dr. Eugene Lind, Dr. Justin Fernando, Dr. Sidney Friedman, Dr. I. Ahmad, Dr. Yelena Chuzin, Dr. Jan Cavanaugh, Dr. Robert Latimar, and J. Sarasti.

### 1.    Dr. Eugene Lind

On April 2, 2004 x-ray reports requested by Dr. Lind showed that Plaintiff's right elbow and cervical spine were both normal.  (Tr. 157-58.)  An MRI report dated October 29, 2004 of Plaintiff's cervical spine revealed multilevel, minimal disc bulges at C5-C6 and C6-C7, and an asymmetric bulge to the right at C3-C4 without definite evidence for herniated disc pulpous,[11]

---

[9] Medial epicondylitis refers to "a painful and sometimes disabling inflammation of the muscle and surrounding tissues of the elbow, caused by repeated strain on the forearm" near the middle of the humerus.  Mosby's at 611.

[10] Degenerative disease is "any disease in which deterioration of structure and function of tissue occurs."  Mosby's at 486.

[11] Herniated disk pulpous refers to "a rupture of the fibrocartilage surrounding an intervertebral disk, releasing the nucleus pulpous that cushions the vertebrae above and below."

spinal stenosis[12] or foraminal narrowing.[13]  (Tr. 155).  In addition, an MRI report of Plaintiff's

right elbow showed small joint effusion[14] and nonspecific soft tissue edema.[15]  (Tr. 156.)

On December 21, 2004, Dr. Kevin Egan, a Fellow of the American Academy of

Orthopedic Surgeons, submitted a report to Dr. Lind diagnosing Plaintiff with medial

epicondylitis in her left elbow.  (Tr. 152.)  Dr. Egan recommended continued anti-inflammatory

medication, therapy, and "progressing with injection," if discomfort persisted.  (Id.)  Dr. Egan

also noted that Plaintiff has full and unrestricted bilateral mobility of her upper extremities,

including her shoulders, elbows and wrists, tenderness in the medial aspect of the left elbow, and

discomfort on "valgus stress." [16]  (Tr. 151.)

In a follow-up letter to Dr. Lind, dated January 18, 2005, Dr. Egan stated that Plaintiff's

condition improved, as there is "no longer any tenderness of the right medial epicondyle and no

discomfort on resisted plasma flexion of the right wrist."[17]  (Tr. 150.)  Dr. Egan also noted that

Mosby's at 808.

[12] Spinal stenosis is the "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone on the space." Mosby's at 1615.

[13] Foramina, also known as "foramen," is an "opening or aperture in a membranous structure or bone, such as the apical dental foramen and the carotid foramen."  Mosby's at 698.

[14] Small joint effusion is the "escape of fluid, for example, from blood vessels as a result of rupture or seepage, usually into a body cavity."  Mosby's at 574.

[15] Edema is "the abnormal accumulation of fluid in interstitial spaces of tissues, such as in the pericardial sac, intrapleural space, peritoneal cavity, or joint capsules."  Mosby's at 571.

[16] Valgus describes "an abnormal position in which a part of the limb is bent or twisted outward, away from the midline."  Mosby's at 1790.

[17] It should be noted that Dr. Egan's first diagnosis addressed the left elbow, and the follow-up diagnosis focused on the right elbow.  (Tr. 150-52.)  ALJ O'Leary's opinion mentions

"[n]eurologically [Plaintiff] is intact of the upper extremities bilaterally."  (Id.)  Plaintiff was

advised to continue the anti-inflammatory medication and the home exercise program for the rest

of the month, and then employ the "wait and see approach."  (Id.)

On June 4, 2005,[18] an x-ray report of Plaintiff's left shoulder showed mild osteoarthritis[19]

with peritendonitis[20] calcarea,[21] while an x-ray report of the Plaintiff's lumbosacral[22] spine was

normal.  (Tr. 141-42.)

　　　　2.　Dr. Justin Fernando

Dr. Fernando conducted Plaintiff's consultative orthopedic examination on January 5,

2006.  (Tr. 197.)  The examination revealed that Plaintiff was in no acute distress, and was able

to walk on her heels and toes without difficulty, and was able to perform a squat at fifty percent.

(Tr. 198.)  Dr. Fernando's upper extremity examination revealed that Plaintiff had limited flexion

and abduction at ninety degrees in both shoulders, but a full range of movement of the elbows,

---

both reports but does not acknowledge this discrepancy.  (Tr. 21.)  However, the discrepancy is
moot because ALJ O'Leary determined that Plaintiff's impairments do not interfere with her
ability to perform her duties as a sewing machine operator.  (Tr. 23.)

[18] ALJ O'Leary cites June 10, 2005 as the date of the x-ray report.  (Tr. 21.)  However, the
record indicates that the x-ray was conducted on June 4, 2005.  (Tr. 141.)

[19] Osteoarthritis refers to "a form of arthritis in which one or many joints undergo
degenerative changes, including subchrondral bony sclerosis, loss of articular cartilage, and
proliferation of bone spurs (osteophytes) and cartilage in the joint."  Mosby's at 1242.

[20] Peritendonitis refers to the inflammation of the "connective tissue sheath of a tendon."
WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE
UNABRIDGED, 1682 (3rd ed. 1993).

[21] Calcarea, also known as "calcar," refers to "a spur or a structure that resembles a spur."
Mosby's at 262.

[22] Lumbosacral pertains to the "lumbar vertebrae and the sacrum."  Mosby's at 1026.

forearms, wrists, and fingers bilaterally.  (Tr. 199.)  The thoracic[23] and lumbar[24] spine

examination showed limited flexion at seventy five degrees, but full extension, lateral flexion,

and rotary movements bilaterally.  (Id.)  Plaintiff performed a straight leg raise to about thirty

degrees bilaterally, and to ninety degrees in the upright position.  (Id.)  The lower extremity

examination was normal.  (Id.)

Dr. Fernando noted that objective limitations could not be established with certainty

because of Plaintiff's general apathy toward upper extremity movements.  (Id.)  It appeared that

Plaintiff was severely restricted in her ability to raise her arms; however, it was difficult to assess

the elbow's degree of limitation, even though Plaintiff's movements were intact.  (Id.)  Although

Plaintiff complained of right elbow tenderness and jumped with pain even at a light touch, the

pathology of the right elbow was difficult to assess because there was no evidence or signs of

acute or chronic inflammation.  (Tr. 199-200.)

3.   Dr. Sidney Friedman

In a June 12, 2006 letter, Dr. Friedman stated that Plaintiff had bilateral varicose veins

prominent in her left calf, and a 1+ edema[25] on her left leg and calf.  (Tr. 244.)  A chest x-ray of

the heart was normal, but there was a flattening of the diaphragm, which suggested chronic

---

[23] Thoracic refers to "the cage of bone and cartilage containing the principle organs of respiration and circulation covering part of the abdominal organs."  Mosby's at 1611.

[24] Lumbar refers to the "part of the body between the thorax and the pelvis."  Mosby's at 1025.

[25] 1+ edema refers to a "[d]octor's grade...on a scale from trace edema (minimal) to four-plus (considerable).  The grade is generally proportional to the severity of the cause - it can range from a temporary sodium overload to a life-threatening problem such as a failing heart."  Marvin M. Lipman, *When Your Feet Swell*, Consumer Reports, Oct. 1, 2005, at 1.

pulmonary disease.[26]  (Tr. 245.)  Pulmonary function testing showed normal spirometry.[27]  (Id.)

Additionally, Dr. Friedman noted that Plaintiff had chronic occupational bronchitis, with an

estimated disability of thirty percent, and varicose veins, with an estimated disability of twenty

five percent.  (Id.)  Dr. Friedman opined that Plaintiff is totally disabled "as a physiological

industrial unit from all causes."  (Id.)  Dr. Friedman recommended otolaryngeal,[28] orthopedic,

and neuropsychiatric evaluations.  (Id.)

  3. Dr. I. Ahmad [29]

  On May 16, 2006, Dr. Ahmad diagnosed Plaintiff with spinal sprain, fibromyositis,[30] and

arthritis.  (Tr. 242.)  Dr. Ahmad stated that Plaintiff's arms and legs were painful and swollen,

and that her grasp was weak.  (Id.)  Crepitus[31] was also present.  (Id.)  Plaintiff's lumbosacral

region and hamstring muscles were spastic, and her lumbar curve was straightened.  (Id.)

Flexion of the lower back was restricted by thirty degrees, and extension and lateral bending

---

[26] Pulmonary disease is "any abnormal condition[ ] of the respiratory system, characterized by cough, chest pain, dyspnea, hemoptysis, sputum production, stridor, and wheezing." Mosby's at 1435.

[27] Spirometry refers to "the laboratory evaluation of the air capacity of the lungs by means of a spirometer," which is "an instrument that measures and records the volume of inhaled and exhaled air, used to assess pulmonary function." Mosby's at 1525.

[28] Otolaryngeal refers to "diseases and injuries of the ears, nose, and throat." Mosby's at 1249.

[29] The record does not include Dr. I. Ahmad's first name.

[30] Fibromyositis is "any one of a large number of disorders characterized by stiffness and joint or muscle pain, accompanied by localized inflammation of muscle and fibrous connective tissues." Mosby's at 676.

[31] Crepitus refers to "flatulence or the noisy discharge of fetid gas from the intestine . . . ." Mosby's at 447.

were restricted by fifteen degrees.  (Id.)  Both the Lasegue's Test[32] and the Straight Leg Raising

Test returned positive results, and caused pain to Plaintiff.  (Id.)  The greater sciatic[33] notches[34]

and sacroiliac joints[35] were tender.  (Id.)  Plaintiff's muscle spasm extended from the

paravertebral[36] area to the buttocks.  (Id.)  Plaintiff exhibited difficulty while squatting and

standing on her toes or heels.  (Id.)

      In addition, Plaintiff's lumbosacral spine was tender and spastic, while the lumbar curve

was normal.  (Id.)  Active and passive ranges of movement were restricted.  (Id.)  There was no

gross neurological deficit in Plaintiff's lower extremities, and the deep tendons were also intact.

(Id.)  Dr. Ahmad concluded that Plaintiff was forty percent disabled.  (Id.)

      4.   <u>Dr. Yelena Chuzin</u>

      On June 15, 2007, Dr. Yelena Chuzin, a rheumatologist, conducted an "Ability To Do

Work-Related Activities" medical report.  (Tr. 247-50.)  The report indicated that Plaintiff is able

to lift and carry less than ten pounds, stand and walk at least two hours in an eight-hour workday,

---

[32] Lasegue's Test, also known as the Straight Leg Raising Test, is performed on patients with a suspected pinched lumbar nerve root.  The test requires the examiner to elevate a straight leg by lifting the foot at the ankle.  ALLAN H. ROPPER & ROBERT H. BROWN, ADAM & VICTOR'S PRINCIPLES OF NEUROLOGY 171, 176 (Allan H. Ropper & Robert H. Brown eds., McGraw Hill 2005) (1977).

[33] Sciatic pertains to "an area near the ischium, such as the sciatic nerve or the sciatic vein."  <u>Mosby's</u> at 1543.

[34] Notches are "indentation[s] or [ ] depression[s] in a bone or other organ, such as the auricular notch or the cardiac notch."  <u>Mosby's</u> at 1195.

[35] The term "sacroiliac joints" refers to joints in "the part of the skeletal system that includes the sacrum and the ilium bones of the pelvis."  <u>Mosby's</u> at 1528.

[36] Paravetebral pertains to "the area alongside the spinal column or near the vertebra."  <u>Mosby's</u> at 1282.

and sit without limitation.  (Tr. 247-48.)  Dr. Chuzin diagnosed Plaintiff with recurrent

synovitis[37] of the right elbow.  (Tr. 248.)  She also noted that Plaintiff has pain in her shoulders,

hands and elbows; swelling in her right elbow; arm stiffness; limited shoulder movement; a

tender left Achilles tendon; and intermittent low back pain.  (Tr. 249.)

   5.   Dr. Jan Cavanaugh

   On January 5, 2006, Dr. Cavanaugh, a psychologist, conducted Plaintiff's psychiatric

evaluation.  (Tr. 201-04.)  Plaintiff was cooperative in demeanor, was responsive to questions,

and was able to follow simple directions and instructions.  (Tr. 202-03.)  Her thought processes

were coherent, without any signs of hallucinations, delusions or paranoia.  (Id.)  Dr. Cavanaugh

noted that Plaintiff's attention and concentration were mildly impaired, and her intellectual

functioning was estimated to be in the below average range.  (Tr. 203.)  Both her judgment and

insight were fair, but Plaintiff was somewhat limited in her ability to deal with stress.  (Id.)  She

was able to maintain a regular schedule with some support, to learn new tasks within the limits of

her ability, and to perform complex tasks independently.  (Id.)  Plaintiff did not exhibit any

psychiatric problems which would prevent her from functioning on a daily basis.  (Tr. 204.)

   6.   Dr. Robert Latimar

   On June 15, 2005, Dr. Robert Latimar conducted a psychiatric evaluation of Plaintiff.

(Tr. 119-21.)  Dr. Latimar noted that Plaintiff was moderately depressed.  (Id.)  Her motor

activity and speech were slow, causing a depressed affect.  (Id.)  Her memory, orientation,

judgment, insight, concentration, attention span, and intellectual capacity were within normal

---

[37] Synovitis is an "inflammatory condition of the synovial membrane of a joint as a result of aseptic wound or traumatic injury, such as a sprain or severe strain."  Mosby's at 1671.

limits.  (Id.)  Additionally, her thinking did not reveal any psychotic trends.  (Id.)  Dr. Latimar diagnosed Plaintiff with adjustment disorder and depression, and found her totally and permanently disabled "as a psychophysiological working unit."  (Tr. 121.)

       7.   <u>J. Sarasti</u> [38]

On January 18, 2006, J. Sarasti ("Sarasti"), an analyst, conducted a Physical Residual Functional Capacity Assessment, and diagnosed Plaintiff with a back disorder.  (Tr. 205-10.)  The report noted that Plaintiff can occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand and walk for about six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and push and pull for an unlimited period.  (Tr. 206).  To support these findings, Sarasti cited records from Dr. Lind, noting improvement of the elbow disorder with physical therapy.  (Id.)  Sarasti also stated that Plaintiff complained of restrictive range of movement in the shoulders and elbows; however, according to Sarasti, the objective records do not demonstrate significant restrictions in Plaintiff's range of movement.  (Id.)  Other objective medical reports also note normal results.  (Id.)  Finally, Sarasti stated that Plaintiff's credibility cannot be assessed.  (Id.)

## III.  DISCUSSION

### A.    <u>Standard of Review</u>

This Court has jurisdiction to review the Commissioner's decision, pursuant to 42 U.S.C. § 405(g).  This Court must affirm the Commissioner's decision if it is "supported by substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); <u>Stunkard v. Sec'y of Health and Human Services</u>, 841 F.2d 57, 59 (3d Cir. 1988); <u>Doak v. Heckler</u>, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial

---

[38] The record does not contain J. Sarasti's first name.

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is more than a mere scintilla of evidence but may be less than a preponderance."  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988) (citing Stunkard, 841 F.2d at 59).  The reviewing court must consider the totality of the evidence and then determine whether there is substantial evidence to support the Commissioner's decision.  See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).  Furthermore, the reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied sub nom. Williams v. Shalala, 507 U.S. 924 (1993) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

In the determination of whether there is substantial evidence to support the Commissioner's decision, the reviewing court must consider: "(1) the objective medical facts; (2) the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family and neighbors; (4) the claimant's educational background, work history and present age." Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1973); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981).  Where there is substantial evidence to support the Commissioner's decision, it is of no consequence that the record contains evidence which may also support a different conclusion.  Blalock, 483 F.2d at 775.

**B.**   **Statutory Standards**

The claimant bears the initial burden of establishing his or her disability.  42 U.S.C. §
423(d)(5).  To qualify for DIB or SSI benefits, a claimant must first establish that he is needy and
aged, blind, or "disabled."  42 U.S.C. § 1381.  A claimant is deemed "disabled" under the Act if
he is unable to "engage in substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in death or which has lasted or
can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. §
423(d)(1)(A); see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  Disability is
predicated on whether a claimant's impairment is so severe that he "is not only unable to do his
previous work but cannot, considering his age, education, and work experience, engage in any
other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §
423(d)(2)(A); see also Nance v. Barnhart, 194 F. Supp. 2d 302, 316 (D. Del. 2002).  Finally,
while subjective complaints of pain are considered, alone, they are not enough to establish
disability.  42 U.S.C. § 423(d)(5)(A).  An impairment only qualifies as a disability if it "results
from anatomical, physiological or psychological abnormalities which are demonstrable by
medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

**C.**   **The Five Step Evaluation Process and the Burden of Proof**

Determinations of disability are made by the Commissioner, pursuant to the five-step
process outlined in 20 C.F.R. § 404.1520.  At the first step of the review, the Commissioner must
determine whether the claimant is currently engaged in substantial gainful activity.[39]  20 C.F.R.
§ 404.1520(b).  If a claimant is found to be engaged in such activity, the claimant is not

---

[39] Substantial gainful activity is "work that involves doing significant and productive
physical or mental duties; and is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

"disabled" and the disability claim will be denied.  Id.; Bowen v. Yuckert, 482 U.S. 137, 141 (1987).

At step two, the Commissioner must determine whether the claimant suffers from a severe impairment.  20 C.F.R. § 404.1520(a)(ii)(c).  An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities."  Id.  In determining whether the claimant has a severe impairment, the age, education, and work experience of the claimant will not be considered.  See id.  If the claimant is found to have a severe impairment, the Commissioner addresses step three of the process.

At step three, the Commissioner compares the medical evidence of the claimant's impairment(s) with the impairments presumed severe enough to preclude any gainful work, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 404.1594(f)(2).  If the claimant's impairment(s) meets or equals one of the listed impairments, he will be found disabled under the Social Security Act.  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.

In Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000), the Third Circuit found that to deny a claim at step three, the ALJ must specify which listings[40] apply and give reasons why those listings are not met or equaled.  In Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), however, the Third Circuit noted that "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.  Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review.  Id.  An ALJ satisfies this standard by "clearly

_____

[40] Hereinafter "listing" refers to the list of severe impairments as found in 20 C.F.R. Part 404, Subpart P, Appendix 1.

evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant listing." Scatorchia v. Comm'r of Soc. Sec., 137 F. App'x 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform his past relevant work. 20 C.F.R. § 404.1520(e). If the claimant is able to perform his past relevant work, he will not be found disabled under the Act. In Burnett, the Third Circuit set forth the analysis at step four:

> In step four, the ALJ must determine whether a claimant's residual functional capacity enables her to perform her past relevant work. This step involves three substeps: (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

Burnett, 220 F.3d at 120. If the claimant is unable to resume his past work, and his condition is deemed "severe," yet not listed, the evaluation moves to the final step.

At the fifth step, the burden of production shifts to the Commissioner, who must demonstrate that there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and residual functional capacity. 20 C.F.R. § 404.1560(c)(1). If the ALJ finds a significant number of jobs that claimant can perform, claimant will not be found disabled. Id.

When the claimant has only exertional limitations, the Commissioner may utilize the Medical-Vocational Guidelines found in 20 C.F.R. Part 404, Subpart P, Appendix 2 to meet the burden of establishing the existence of jobs in the national economy. These guidelines dictate a result of "disabled" or "not disabled" according to combinations of vocational factors, such as

age, education level, work history, and residual functional capacity.  These guidelines reflect the administrative notice taken of the jobs in the national economy that exist for particular combinations of vocational factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).  When a claimant's vocational factors, as determined in the preceding steps of the evaluation, coincide with a combination listed in Appendix 2, the guideline directs a conclusion as to whether an individual is disabled.  20 C.F.R. § 404.1569; Heckler v. Campbell, 461 U.S. 458, 462 (1983).  The claimant may rebut any finding of fact as to a vocational factor.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).

Additionally, pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner "must analyze the cumulative effect of the claimant's impairments in determining whether she is capable of performing work and is not disabled."  Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999). Moreover, "the combined impact of the impairments will be considered throughout the disability determination process."  42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 1523; Parker v. Barnhart, 244 F. Supp. 2d 360, 369 (D. Del. 2003).  However, the burden still remains on the Plaintiff to prove that the impairments in combination are severe enough to qualify him for benefits.  See Williams v. Barnhart, 87 F. App'x. 240, 243 (3d Cir. 2004) (placing responsibility on the claimant to show how a combination-effects analysis would have resulted in a qualifying disability); see also Marcus v. Barnhart, No. 02-3714, 2003 WL 22016801, at *2 (E.D. Pa. Jun. 10, 2003) (stating that "the burden was on [Plaintiff] to show that the combined effect of her impairments limited one of the basic work abilities").

While Burnett involved a decision in which the ALJ's explanation of his step three determination was so inadequate as to be beyond meaningful judicial review, the Third Circuit applies its procedural requirements, as well as their interpretation in Jones, to every step of the

decision.  See, e.g., Rivera v. Comm'r, 164 F. App'x. 260, 262 (3d Cir. 2006).  Thus, at every step, "the ALJ's decision must include sufficient evidence and analysis to allow for meaningful judicial review," but need not "adhere to a particular format."  Id.

**D.      ALJ O'Leary's Findings**

ALJ O'Leary applied the five-step sequential evaluation and determined Plaintiff was not disabled within the meaning of the Act.  (Tr. 23.)

1.    Step One

ALJ O'Leary found that Plaintiff satisfied step one of the evaluation process because she "ha[d] not engaged in any substantial gainful activity since November 30, 2004, the alleged onset date."  (Tr. 18.)

2.    Step Two

Regarding step two, ALJ O'Leary found that the Plaintiff has the following severe impairments: medial epicondylitis, or "tennis elbow," and a neck impairment.  (Id.)  ALJ O'Leary also noted, "Although there is some evidence in the record of bronchitis and depression [sic] these impairments, as discussed below, were not shown to cause more than minimal, if any limitation and are therefore not considered severe."  (Id.)

3.    Step Three

ALJ O'Leary concluded that although Plaintiff has "severe" impairments, "they are not attended, singly or in combination, with the specific clinical signs and diagnostic findings required to meet or equal requirements set forth in the Listing of Impairments under 1.00 for the Musculoskeletal System."  (Id.)  In reaching this conclusion, ALJ O'Leary gave specific consideration to listing 1.02, which requires "gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s),

18

and finding on appropriate medically acceptable imaging of joint space narrowing, bony [sic] destruction or ankylosis of the affected joint." (Tr. 18.) In addition, listing 1.02 requires one major peripheral joint in the upper extremity, such as the shoulder, elbow or wrist-hand, to be unable "to perform fine and gross movements effectively, as defined in 1.00B2." (Tr. 18-19.) According to ALJ O'Leary, the evidence in this case does not satisfy the specific requirements in the listings. (Tr. 19.)

    4.  <u>Step Four</u>

Upon reviewing all of Plaintiff's medical reports, ALJ O'Leary concluded that Plaintiff "has the residual functional capacity to perform a full range of work [sic] light work [, including] the abilities to lift and carry up to twenty pounds occasionally, ten pounds frequently and stand, walk and sit for six hours in an eight-hour workday." (Tr. 19.)

In reaching this conclusion, ALJ O'Leary relied on medical reports by Dr. Eugene Lind, Dr. Justin Fernando, Dr. Jan Cavanaugh, and Dr. Robert Latimar. (Tr. 21-23.) ALJ O'Leary also "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence . . . ." (Tr. 19.) In evaluating Plaintiff's subjective complaints, O'Leary considered

> (1) [t]he claimant's daily activities; (2) [t]he location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) [f]actors that precipitate and aggravate the symptoms; (4) [t]he type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) [t]reatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) [a]ny measures other than treatment the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) [a]ny other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

(<u>Id.</u>) (citations omitted.)

ALJ O'Leary noted that Plaintiff stopped working due to pain in her shoulders and elbows. (Tr. 20.) Her duties as a sewing machine operator required her to lift thirty to fifty coats at a time, curve over the sewing machine, and use her feet to start and stop the machine every two seconds. (Id.) She was not allowed to stop working. (Id.) She completed each coat in about four to five minutes, and a bundle in about two hours. (Id.) Plaintiff complained of losing her strength and straining her back, and suffered from heavy duty varicose veins and pain in her left leg. (Id.) Her lower back pain restricted her ability to sit for twenty minutes at a time and stand for fifteen minutes at a time. (Id.) Her left leg pain allowed her to walk only two blocks at a time. (Id.)

ALJ O'Leary also emphasized Plaintiff's lifestyle outside of work. Plaintiff lives with her husband and daughter, who do the cooking and shopping. (Id.) Plaintiff is able "read and walk a little outside. During the day and [sic] she is able to do little things around the house such as setting the table." (Id.) Plaintiff also attends church from time to time. (Id.) At the hearing, Plaintiff testified with the aid of a Portugese interpreter; however,

> she has been a United States citizen for 23 years, certified when she applied for citizenship that she could speak English and passed a written test in English to become a citizen. She also noted on her application for disability that she could speak, read and write English. She testified that she can only speak a little English, but in the light of foregoing, she is not entitled to the 5 year advantage that non English speaking people enjoy.

(Tr. 23.)

ALJ O'Leary concluded that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 20.) Reports from Drs. Ahmad, Friedman, and Chuzhin were not supported by

the entire record, explained ALJ O'Leary, and are entitled to little weight.  (Tr. 23.)  None of the treating physicians concluded that Plaintiff is disabled or unable to work.  (Id.)  Plaintiff's radiological evidence was normal, and the DDS found that Plaintiff has the ability to do light work.  (Id.)

ALJ O'Leary determined that Plaintiff could perform her past relevant work as a sewing machine operator.  (Tr. 23.)  At that job, Plaintiff was required to "sit for 8 hours, lift up to 20 pounds occasionally and 10 pounds frequently."  (Id.)  Plaintiff's residual functional capacity does not preclude her from performing these work-related activities.  (Tr. 23.)

## IV.  ANALYSIS

Plaintiff contends that ALJ O'Leary's decision should be reversed because his decision is not supported by substantial evidence.  (Pl.'s Br. 2).  Specifically, Plaintiff alleges that ALJ O'Leary: 1) erred in evaluating Plaintiff's subjective complaints about her pain and the physical nature of her work; and 2) did not base his finding that Plaintiff had the residual functional capacity to return to her past relevant work on substantial evidence.[41]  (Id.)

---

[41] Plaintiff also alleges that a review of ALJ O'Leary's decision indicates an anti-immigrant sentiment.  (Pl.'s Br. 14.)  Plaintiff claims that ALJ O'Leary's statements concerning Plaintiff's ability to communicate in English, the gaps in Plaintiff's work history, and Plaintiff's salary are all irrelevant to the decision.  (Tr. 14-15.)  However, the Code of Federal Regulations state that an administrative law judge "will consider all of the medical and vocational evidence in your file to decide whether or not you have the ability to engage in substantial gainful activity."  20 C.F.R. § 404.1571 (2008).  Likewise, administrative law judges "consider a person's ability to communicate in English when [they] evaluate what work, if any, he or she can do."  20 C.F.R. § 404.1564(b)(5) (2008).  ALJ O'Leary's factual statements about Plaintiff's language ability and work history are simply a part of the disability analysis.

Furthermore, the administrative law judge is presumed to be unbiased and the claimant bears the burden of showing otherwise.  Kittler v. Astrue, 231 F. App'x 524, 526 (8th Cir. 2007) (citing Rollins v. Massanari, 261 F.3d 853, 857-58 (9th Cir. 2001)).  There is no indication in the record that ALJ O'Leary was motivated by anti-immigrant sentiment.  Plaintiff fails to cite any such part of the record, and therefore, has not carried the burden of showing bias.

1. Whether the ALJ Failed to Evaluate Properly Plaintiff's Testimony About Her Pain and Physical Nature of Work

Plaintiff contends that ALJ O'Leary failed to evaluate her subjective complaints about the "severe problems in the use of her arms," and "did not appropriately assess [her] testimony as to the physical nature of [her] work." (Pl.'s Br. 15.) Plaintiff also claims that ALJ O'Leary failed to take her son's testimony into consideration. (Id.)

"An ALJ must consider a claimant's subjective symptoms, including pain, and may not discount those symptoms if they are reasonably consistent with the objective medical evidence and other evidence in the record." Robleto v. Barnhart, No. 05-4843, 2006 WL 2818431, at *10 (E.D. Pa. 2006) (citing Chrupcala v. Heckler, 829 F.2d 1269, 1275-76 (3d Cir. 1987); 20 C.F.R. § 404.1529 (2008)). "It is the ALJ's responsibility to resolve conflicts in the evidence and to determine credibility and the relative weights to give to the evidence." Id. (citing Plummer, 186 F.3d at 429; Mason v. Shalala, 99 F.2d 1058, 1066 (3d Cir. 1993)). Plaintiff's "subjective complaints of pain will not be conclusive evidence of disability absent objective medical evidence that demonstrates the existence of [the] medical impairment." See Robleto, 2006 WL 2818431, at *10 (citing 20 C.F.R. § 416.929(a); Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999)).

In addition, an administrative law judge is not "require[d] . . . [to] mention[ ] every item

---

Additionally, the Code of Federal Regulations provide procedures one can follow to disqualify a biased judge. "The claimant must bring any objections to the attention of the ALJ, and the ALJ shall decide whether to continue the hearing or withdraw. [I]f the ALJ does not withdraw, the claimant may present objections to the Appeals Council as reasons why the hearing decision should be revised or a new hearing held before another ALJ." Ventura v. Shalala, 55 F.3d 900, 902 (3d Cir. 1995) (citing 20 C.F.R. §§ 404.940 and 416.1440 (1994)). Plaintiff failed to follow any of these procedures. In fact, Plaintiff neglected to mention ALJ O'Leary's alleged bias in any previous proceedings. Therefore, Plaintiff's argument regarding ALJ O'Leary's alleged bias is without merit.

of testimony presented to him or [ ] explain[ ] why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983); see also Blowers v. Astrue, No. 05-557, 2008 U.S. Dist. LEXIS 10373, at *19 (N.D.N.Y. Feb. 12, 2008). Accordingly, an administrative law judge's "credibility determinations are entitled to great deference and should not be discarded lightly." Robleto, 2006 WL 2818431, at *10 (citing Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003)).

As noted by ALJ O'Leary, objective evaluations by both independent and state agency doctors failed to demonstrate the existence of medical impairments which could be expected to produce Plaintiff's subjective claims, and which would prevent her from continuing her work. (Tr. 23.) Plaintiff complained that she suffers from pain in her elbows, back and left leg; swollen feet; varicose veins; and a small hernia in her foot. (Tr. 261-73.) Plaintiff testified at the hearing that she has tendinitis in her elbow and arthritis in her shoulders. (Tr. 265.)

However, on April 2, 2004 x-ray reports requested by Dr. Lind showed that Plaintiff's right elbow and cervical spine were both normal. (Tr. 157-58.) An MRI report from October 29, 2004 of the cervical spine did not show definite signs of herniated nucleus pulpous, spinal stenosis, or foraminal narrowing. (Tr. 155.) An MRI report of the right elbow only showed small joint effusion and nonspecific soft tissue edema. (Tr. 156.)

In addition, Dr. Egan diagnosed Plaintiff with medial epicondylitis of the left elbow on December 21, 2004; however, in a follow-up visit on January 18, 2005, Dr. Egan stated that Plaintiff's condition improved, as there is "no longer any tenderness of the right medial epicondyle and no discomfort" in the right wrist. (Tr. 150.)

On January 5, 2006, during an orthopedic examination, Dr. Fernando noted that although Plaintiff jumped at his slight touch, it was difficult to access the pathology of Plaintiff's right

elbow because there was no evidence or signs of acute or chronic inflammation.  (Tr. 199-200.)

Dr. Fernando also stated that Plaintiff had full range of bilateral movement in her elbows,

forearms, wrists, and fingers.  (Tr. 199.)  Plaintiff's lower extremity examination was normal.

(Id.)

ALJ O'Leary also considered Plaintiff's testimony about the physical nature of her work.

(Tr. 20.)  ALJ O'Leary stated that Plaintiff's work, as a sewing machine operator, required her to

lift heavy materials, sit for a prolonged period of time, and use her left leg to control the sewing

machine.  (Tr. 20.)  After consideration of objective medical reports and Plaintiff's account of the

physical nature of her work, ALJ O'Leary concluded that Plaintiff had "the abilities to lift and

carry up to twenty pounds occasionally, ten pounds frequently, and stand, walk, and sit for six

hours in an eight-hour workday."  (Tr. 19.)

Plaintiff correctly points out that ALJ O'Leary did not mention Plaintiff's son's testimony

in his decision.  However, that does not indicate that ALJ O'Leary did not evaluate the son's

testimony when making his decision.  ALJ O'Leary specifically stated that his decision is based

on "careful consideration of the entire record."  (Tr. 19.)  As stated earlier, an administrative law

judge is not required to mention all testimony and evidence he evaluated when making his

decision.  Mongeur, 722 F.2d at 1040.

ALJ O'Leary opined that there is "really very few medical [sic] that supports her case . . .

[h]er impairment would not interfere with her ability to perform her past job as a sewing machine

operator."  (Tr. 23.)  This Court concludes that ALJ O'Leary properly evaluated Plaintiff's

subjective complaints and testimony.

2. <u>Whether the ALJ's Finding that Plaintiff had the Residual Functional Capacity to Return to Her Past Relevant Work was Based on Substantial Medical Evidence</u>

Plaintiff alleges that ALJ O'Leary's determination that Plaintiff had the residual functional capacity to return to work as a sewing machine operator was not based on substantial evidence for two reasons.  First, Plaintiff argues that ALJ O'Leary erroneously considered the State Agency Assessment, which was conducted by an analyst, not a physician.  (Pl.'s Br. 17.) Second, Plaintiff avers that ALJ O'Leary did not give enough consideration to Dr. Fernando's testimony.  (<u>Id.</u> at 20.)

 When reviewing the Commissioner's finding, this Court must consider the totality of the evidence and determine whether there is substantial evidence to support the Commissioner's decision.  <u>See</u> <u>Taybron</u>, 667 F.2d at 413.  In determining whether there is substantial evidence to support the Commissioner's decision, the reviewing court must consider, <u>inter alia</u>, "(1) the objective medical facts; [and] (2) the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact . . . ."  <u>Blalock</u>, 483 F.2d at 776; <u>Curtin</u>, 508 F. Supp. at 793.

"Regardless of its source, [an administrative law judge] will evaluate every medical opinion . . . receive[d]."  20 C.F.R. § 404.1527(d) (2008).  A state agency consultant's findings will be weighed and considered in conjunction with the supporting evidence in the case record. <u>Id.</u>

Plaintiff claims that the State Agency Assessment should not be considered because it was conducted by an analyst, and not a physician.  (Tr. 17. )  Plaintiff does not cite any case law or statutory law stating that only physicians are required to conduct state agency assessments. Furthermore, ALJ O'Leary relies on substantial medical evidence in order to make the residual

functional capacity determination at step four of the analysis.  (Tr. 21-23.)  ALJ O'Leary evaluated medical reports from Dr. Lind, Dr. Fernando, Dr. Friedman, Dr. I Ahmad, Dr. Chuzhin, Dr. Cavanaugh, and Dr. Latimar, in addition to the state agency assessment.  (Id.)  It is clear that ALJ O'Leary does not depend solely on the state agency's assessment to make his residual functioning capacity determination.  He considered the assessment as part of the whole medical record.

Finally, Plaintiff alleges that ALJ O'Leary did not properly consider Dr. Fernando's examination, at which he concluded that Plaintiff had epicondylitis.  However, this argument is without merit, as ALJ O'Leary discusses Dr. Fernando's findings in depth in his decision.  ALJ O'Leary discusses Plaintiff's January 6, 2006 meeting with Dr. Fernando, at which Dr. Fernando diagnosed Plaintiff with a full range of movement in the elbows, forearms, wrists and fingers bilaterally, and full bilateral extension, lateral flexion, and rotary movements.   (Tr. 21.)

ALJ O'Leary also notes that Dr. Fernando found the upper and lower extremity examination to be normal.  (Id.)  Dr. Fernando disclosed that Plaintiff jumped with pain at the slight touch of the elbow, but Dr. Fernando found it difficult to assess the degree of limitation or the pathology of the pain because there were no signs of inflammation, either acute or chronic.  (Id.)  ALJ O'Leary gave proper consideration to Dr. Fernando's medical reports, and throughly discussed his findings.  ALJ O'Leary concluded that "after careful consideration of the *entire* record, I find that the claimant has the residual functional capacity to perform a full range of work [sic] light work."  (Tr. 19) (emphasis added).

Based on all of the evidence, this Court finds that ALJ O'Leary's finding is supported by substantial evidence in the record.  He properly evaluated the State Agency Assessment, as well

as Dr. Fernando's medical reports.

## **CONCLUSION**

For the reasons stated above, this Court finds that the Commissioner's decision is supported by substantial evidence, and shall be affirmed.


 S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.

Date: July 25, 2008